IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| **MATTHEW J. KERNS** | § § | Case No. 19-60808 |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| MATTHEW J. KERNS | § § | |
| Plaintiff | § | |
| v. | § § | Adversary No. 21-06018 |
| FIRST STATE BANK OF BEN WHEELER | § § § | |
| Defendant | § | |

# **MEMORANDUM OF DECISION**

This case requires the Court to consider whether a bank may be held liable for violating the automatic stay or a discharge order after making a report resulting in Debtor's criminal prosecution for an allegedly criminal sale of cattle and farm equipment. The Court finds that under the circumstances of this case the bank should not be held liable, but cautions that this result should not be understood as an invitation for unhappy creditors to seek redress for unpaid debts in the criminal justice system. Today's decision results solely from the safe harbor provision applicable to financial institutions, which most creditors do not enjoy.

# I. JURISDICTION

The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1334 and 157. The Court has the authority to enter a final judgment in this adversary proceeding because it constitutes a statutorily core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (G), and (O), and meets all constitutional standards for the proper exercise of full judicial power by this Court.

# II. FACTS AND PROCEDURE

Plaintiff, Matthew J. Kerns, was a member and manager of Glade Creek Livestock, LLC.[1] The LLC authorized Plaintiff to obtain credit on its behalf using the company's assets as collateral.[2] Under that authority, Plaintiff approached Defendant, the First State Bank of Ben Wheeler, to obtain a loan.[3] Plaintiff offered as security equipment valued at $258,000.00 and 206 head of cattle valued at $209,280.00.[4] Defendant inspected the equipment and cattle to be pledged, and prepared an itemized list using information provided by Plaintiff which Plaintiff signed.[5] After inspection, Defendant agreed to make a loan to the

---

[1] Def. Mot. Summ. J., ECF No. 40 at 2.

[2] *Id.,* Exh. 4 at 1.

[3] *Id.,* Exh. 4 at 2.

[4] *Id.,* Exh. 4 at 1.

[5] *Id.*

LLC, and two separate security agreements were signed dated May 24, 2017.[6] Defendant filed UCC financing statements on May 25 and May 26 of 2017 to perfect its liens on the collateral.[7] Plaintiff admits he guaranteed the loan, though no such guaranty was submitted into evidence by Defendant.[8]

In 2019, the LLC experienced financial difficulties and Plaintiff approached Defendant about a possible loan workout regarding repayment.[9] Defendant conducted a collateral inspection, but was unable to find some of the pledged equipment and cattle.[10] Defendant alleges that only 55 of the approximately 200 cattle remained.[11] Defendant, no longer willing to entertain a possible loan workout, instead demanded repayment and threatened to repossess all remaining collateral if not repaid.[12] The loan was not repaid and all remaining collateral Defendant could find was repossessed.[13] Plaintiff admits

---

[6] *Id.*, Exh. 4 at 1-2.

[7] *Id.*, Exh. 6 at 1-2. Whether these financing statements were sufficient to perfect Defendant's liens is not at issue in this proceeding.

[8] Resp. Def. Mot. Summ. J., ECF No. 41, Exh. 1, ¶ 4.

[9] Def. Mot. Summ. J., ECF No. 40, Exh. 1 at 21.

[10] *Id.*, Exh. 1 at 22.

[11] *Id.*, Exh. 5 at 1.

[12] *Id.*, Exh. 5 at 1-2.

[13] *Id.*, Exh. 6 at 1-2.

that some of the cattle had been already been sold when the demand was made, while certain equipment securing the loan remains missing.[14]

Plaintiff filed his voluntary Chapter 7 petition on November 11, 2019.[15] After Plaintiff filed bankruptcy while the automatic stay was in effect, Defendant contacted Special Ranger Jimmy Dickson.[16] Defendant's representatives reported Plaintiff for "possible violations of state law."[17] Ranger Dickson is a licensed peace officer who was employed as a Special Ranger by the Texas and Southwestern Cattle Raisers Association.[18]

Special Ranger Dickson proceeded to conduct an investigation of Plaintiff.[19] After investigating, Special Ranger Dickson found information to "support[] a Hindering a Secured Creditor case against Glade Creek Livestock, LLC with Matthew J. Kerns as manager."[20] He thereafter reported Plaintiff to

---

[14] *Id.,* Exh. 6 at 1-2.

[15] Pet., Case No. 19-6080, ECF No. 1.

[16] Def. Mot. Summ. J., ECF No. 40 at 8.

[17] *Id.*, Exh. 6 at 3.

[18] Def. Mot. Summ. J., ECF No. 40 at 8.

[19] *Id.*, Exh. 3.

[20] *Id.* Texas law contains a criminal offense for "Hindering Secured Creditors." Tex. Penal Code § 32.33(b). In part this statute provides: "A person who has signed a security agreement creating a security interest in property or a mortgage or deed of trust creating a lien on property commits an offense if, with intent to hinder enforcement of that interest or lien, he destroys, removes, conceals, encumbers, or otherwise harms or reduces the value of the property." *Id.*

the Van Zandt County District Attorney.[21] Plaintiff received a discharge on February 21, 2020.[22] Plaintiff was indicted on June 26, 2020 by a grand jury, and arrested on July 21, 2020 by Special Ranger Dicksonon on charges of hindering a secured creditor.[23]

Plaintiff filed this proceeding on December 31, 2023, seeking damages for alleged violations of the automatic stay of 11 U.S.C. § 362(a) and Plaintiff's discharge under 11 U.S.C. § 524(a).[24] Defendant timely answered.[25] Defendant file its Motion for Summary Judgment on December 14, 2022.[26] Defendant's motion asks this Court to find that its reporting of Plaintiff to Special Ranger Dickson falls within the § 362(b)(1) exception to the automatic stay, and that as a financial institution it cannot be found liable for violating either § 362(a) nor § 524(a) due to the safe harbor provision of the Annunzio-Wylie Act.[27] Plaintiff timely responded.[28]

---

[21] Def. Mot. Summ. J., Exh. 3.

[22] Ord. of Disch., Case No. 19-6080, ECF No. 25.

[23] Def. Mot. Summ. J., Exh 3 at 8-9; Resp. Def. Mot. Summ. J., ECF No. 41, Exh. 1.

[24] ECF No. 1.

[25] ECF No. 10.

[26] ECF No. 40.

[27] 31 U.S.C. § 5318(g)(3)(A).

[28] ECF No. 41.

## III. SUMMARY JUDGMENT STANDARD

A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catlett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). Thus, if summary judgment is appropriate, the Court may resolve the case as a matter of law.

The moving party always bears the initial responsibility of informing the court of the basis for its motion and producing evidence which it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. How the necessary summary judgment showing can be made depends upon which party will bear the burden of proof at trial. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1077 n.16 (5th Cir. 1994). "A fact is material only if its resolution would affect the outcome of the action . . ." *Wiley v. State Farm Fire and Cas, Co.*, 585 F.3d 206, 210 (5th Cir. 2009). "All reasonable inferences must be viewed in the light most favorable" to the nonmoving party, and "any doubt must resolved in favor of the nonmoving party." *In re Louisiana Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017) (citing *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## IV. DISCUSSION

The Court first considers whether Defendant's actions fall into the safe harbor provision of the Annunzio-Wylie Act. If the safe harbor applies, then the Court needs not decide the questions regarding §§ 362 and 524.

The purpose of the Annunzio-Wylie Act has been described by at least one Court as follows:

> "In 1992, Congress enacted the Annunzio-Wylie Act, 31 U.S.C. § 5318(g)(1). The Act, in pertinent part, gave the Secretary of the Treasury authority to 'require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation.' 31 U.S.C. § 5318(g)(1). Congress sought to 'uncover and punish money laundering, particularly in connection with drug trafficking . . .' through both voluntary and required reporting. *Stoutt v. Banco Popular de P.R.*, 158 F. Supp. 2d 167, 173 (D.P.R. 2001) (*citing Nevin v. Citibank*, 107 F. Supp. 2d 333, 341 (S.D.N.Y. 2000))."

*Quiles-Gonzalez v. United States*, No. CIVIL 09-1401CCC, 2010 U.S. Dist. LEXIS 33111, at *10-11 (D.P.R. 2010). Specifically, the Act contains the following safe harbor provision:

> "*Any* financial institution that makes a voluntary disclosure of *any* possible violation of law or regulation to a government agency or makes a disclosure pursuant to this subsection or *any* other authority, and any director, officer, employee, or agent of such institution who makes, or requires another to make any such disclosure, shall not be liable to any person under *any* law or

regulation of the United States" (emphasis added).

31 U.S.C. § 5318(g)(3). Courts have generally agreed on the breadth of this safe harbor. *See Stoutt v. Banco Popular de P.R.*, 158 F. Supp. 2d 167, 173 (D.P.R. 2001); *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 544 (2d Cir. 1999); *Gregory v. Bank One, Indiana, N.A.*, 200 F. Supp. 2d 1000, 1002-03 (S.D. Ind. 2002); *Bank of Eureka Springs v. Evans*, 353 Ark. 438, 451, 109 S.W.3d 672, 680 (2003); *Gibson v. Regions Financial Corp.*, 2008 WL 110917 at *3 (E.D. Ark. January 9, 2008).

Courts have not agreed on whether the safe harbor contains a requirement that to receive protection a financial institution may only make a criminal report in good faith. Most courts considering this question have relied upon the broad plain language of the safe harbor and corresponding regulation to hold that protection is not contingent on good faith. "There is not even a hint that the statements must be made in good faith in order to benefit from immunity." *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 544 (2d Cir. 1999); *see also Joseph v. BancorpSouth Bank*, 414 F. Supp. 2d 609, 612 (S.D. Miss. 2005). Compare these cases to the Eleventh Circuit's *Lopez* decision, which found the safe harbor was subject to a good faith requirement. *Lopez v. First Union Nat'l Bank*, 129 F.3d 1186, 1195 (11th Cir. 1997). The *Lopez* decision has, however, "been the subject of significant criticism." *Whitney Nat'l Bank v. Karam*, 306 F. Supp. 2d 678, 680 (S.D. Tex. 2004).

This Court could find no Fifth Circuit decision on this issue. There is significant authority, however, that an unambiguous statute should be read according to its plain meaning. "The task of statutory interpretation begins and, if possible, ends with the language of the statute." *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013); *see also BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [the court] to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'") (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)). The extensive use of the words "any" and "all" indicate to this Court that the § 5318(g) safe harbor was intended to make sure financial institutions need not hesitate when making "any . . . voluntary disclosure . . . of any possible . . . violation of law . . . to a government agency . . . or any other authority. . ." 31 U.S.C. § § 5318(g)(3)(a). In the absence of contrary Fifth Circuit authority, the Court declines to read a good faith contingency into the unambiguously broad language of the safe harbor.

The question then remains under the facts of this case, does the safe harbor apply to protect Defendant from liability to Plaintiff for alleged violations of 11 U.S.C. §§ 362 and 524? Neither party disputes that Defendant is a financial institution, Defendant made a voluntary disclosure regarding a

suspected violation of state criminal law by Plaintiff to Special Ranger Dickson, and resulting liability, if any, would be under 11 U.S.C. §§ 362 or 524 which are laws of the United States. Instead, Plaintiff contests the applicability of the safe harbor on three legal grounds. Plaintiff argues (1) the safe harbor requires a qualifying disclosure to be made in a Suspicious Activity Report ("SAR"), (2) the safe harbor is inapplicable to reporting violations of state law, and (3) the voluntary disclosure in this case was not made to a government agency nor any other authority as contemplated by the safe harbor.

*i. Does the safe harbor only apply to the filling of SARs?*

Regulations have been promulgated relating to implementation of the Annunzio-Wylie Act.[29] Plaintiff contends the safe harbor is inapplicable under these regulations because no evidence shows Defendant filed a SAR.[30] Plaintiff points the Court to a portion of these regulations stating that "this section ensures that a member bank files a Suspicious Activity Report when it detects a known or suspected violation of Federal law, or a suspicious transaction related to a money laundering activity or a violation of the Bank Secrecy Act."

---

[29] 12 C.F.R. § 208.60(a), et. seq.; *see also* 12 C.F.R. § 21.11, et. seq.

[30] Pl. Resp., ECF No. 41 at 11.

12 C.F.R. § 208.62(a).³¹ Plaintiff also points the Court to the requirement that "[a] member bank is required to file a SAR no later than 30 calendar days after the date of initial detection of facts that may constitute a basis for filing a SAR." 12 C.F.R. § 208.62(d).

The safe harbor is broader than the requirements for financial institutions to file a SAR. The regulation describes the scope of the safe harbor as follows:

> "The safe harbor provision of 31 U.S.C. § 5318(g), which exempts *any* financial institution that makes a disclosure of *any* possible violation of law or regulation from liability under *any* law or regulation of the United States, or *any* constitution, law, or regulation of any state or political subdivision, covers *all* reports of suspected or known criminal violations and suspicious activities to law enforcement and financial institution supervisory authorities" (emphasis added).

12 C.F.R. § 208.62(k).³² The plain language referencing "all" reports is broader than a reference only to a SAR. This makes logical sense because SAR is a defined term in the regulation used throughout the statute. 12 C.F.R. § 208.62(b)(3). The regulation at § 208.62(k) does not exclusively refer to reports

---

³¹ The Court notes that the cited regulation deals with the regulation of state chartered banks as opposed to nationally chartered banks. Neither party discussed whether Defendant is a state or national bank. However, for purposes of this case the distinction is immaterial because the regulations regarding federally chartered banks (12 C.F.R. § 21.11) is almost identical to that regarding stated chartered banks (12 C.F.R. § 208.62).

³² Similar language can be found at 12 C.F.R. § 21.11(l) regarding national banks.

made only in a SAR, nor does the Court read the underlying statutory provision at § 5318(g) to be so narrow.[33]

### ii. Does the safe harbor only apply to the reporting of federal crimes?

The Court disagrees with Plaintiff's argument that the safe harbor only applies if Defendant reported "a federal criminal violation, money laundering, or a violation of the Bank Secrecy Act."[34] The portion of the regulation Plaintiff cites only discusses when a SAR is required. 12 C.F.R. § 208.62(c)(1), (c)(2), (c)(3), and (c)(4). The safe harbor is not so narrow, and instead covers the "disclosure of *any* possible violation of law" (emphasis added). 12 C.F.R. § 208.62(k). Use of the word "any" makes clear that the reported crime need not be a violation of federal law for the safe harbor apply. This conclusion is supported by the language of the statute itself, which states that the safe harbor covers ". . . a voluntary disclosure of *any* possible violation of law or regulation . . ." (emphasis added). 31 U.S.C. § 5318(g)(3).

### iii. Must a safe harbor report be made to a government agency?

Plaintiff argues the § 5318(g)(3) safe harbor "requires that the disclosure of a possible violation of the law must be made to a 'government agency'" which

---

[33] The Court of course recognizes that 31 U.S.C. § 5318 pre-dates 12 C.F.R. § 208.62 and likely for that reason does not use the term SAR.

[34] Pl. Reply, ECF No. 41 at 11-12.

Plaintiff interprets to mean a federal agency.[35] In fact, the safe harbor is implicated when a financial institution makes a disclosure "to a government agency *or* makes a disclosure pursuant to this subsection *or any other authority*." 31 U.S.C. § 5318(g)(3) (emphasis added). The pertinent phrase is "any other authority.[36] Numerous other courts have found reports to state law enforcement as within the scope of the safe harbor. *Urias v. Lolman*, 15-cv-00794-MCA-GJF, 2016 WL 10543137, at *3 (D.N.M. Apr. 12, 2016)("In sum, the Act and the related regulations provide immunity to financial institutions from liability arising from the act of reporting suspicious financial activity to federal, *state, and local law enforcement authorities*.") (emphasis added); *Markley v. U.S. Bank Nat'l Ass'n*, No. 19-cv-01130-RM-NYW, 2020 WL 12602882, at *3 (D. Colo. Dec. 29, 2020) ("To encourage disclosure, the AML and its implementing regulations provide immunity to financial institutions from liability arising from the act of reporting suspicious financial activity to federal, state, and local law enforcement authorities"); *Sow v. U.S.*, 2008 WL 11502060 at * 2 (S.D. Ind. Dec.

---

[35] Pl. Resp., ECF No. 41 at 11.

[36] Without digressing into the esoteric, the word "authority" here could refer either to a statutory or other legal authority if modifying the prior phrase "to this subsection," or alternatively to a government authority of a type other than a "government agency" such as for example an arm of state law enforcement. The Court looks to case law to help determine which reading is more persuasive, but the distinction is without import in this case. Tex. Pen. Code 32.33 is a statutory or other legal authority while an arm of state law enforcement is a government authority.

17, 2008) ("The immunity applies even if the disclosure to law enforcement of suspected or possible criminal activity is later found to be erroneous and/or not made in good faith"); *Nevin v. Citibank, N.A.*, 107 F. Supp. 2d 333, 342(S.D. N.Y. 2000) ("If Citibank and CCSI wish to invoke Annunzio–Wylie protection in cases of suspected credit card fraud (which are unquestionably covered by the statute), then they should contact local law enforcement directly.") Thus, the Court finds that Defendant was not required to make its report to a federal agency for the safe harbor of 31 U.S.C. § 5318 to apply, and that a report to a local law enforcement authority qualifies for the safe harbor.

*iv. Is a special ranger considered a law enforcement authority?*

Finally, the Court must consider whether a report to a Special Ranger of the Texas and Southwestern Cattle Raisers Association is a "voluntary disclosure . . . to a government agency . . . or any other authority" for purposes of the safe harbor. 31 U.S.C. § 5318(g)(3). Plaintiff argues that such special rangers do not qualify for safe harbor and that: "Defendant did not report a possible violation of the law to a government agency. It was reported to an employee of the Texas & Southwestern Cattle Raisers Association."[37]

The idea of a law enforcement officer specially appointed as a ranger to

---

[37] Pl. Resp., ECF No. 41 at 11.

investigate cattle theft is an unusual quirk of Texas law.[38] These special rangers may "make arrests and exercise all authority given peace officers under this code [Texas Code of Criminal Procedure] when necessary to prevent or abate the commission of an offense involving livestock or related property." Tex. Code Crim. Pro. Ann. art. 2.125(b). A special ranger must meet the same competency requirements as other peace officers licensed in Texas.[39] It stands to reason that the ability to make a criminal arrest under color of law qualifies one as a member of law enforcement, and in fact "rangers" who are "commissioned by the Public Safety Commission and the Director of the Department of Public Safety" are "peace officers." Tex. Code Crim. Pro. Ann. art. 2.12(4). According to Texas law "[i]t is the duty of every peace officer to preserve the peace within the officer's jurisdiction" using "lawful means." Tex. Code Crim. Pro. Ann. art. 2.13(a). Therefore, the Court finds that special rangers who are licensed peace officers are members of a law enforcement authority for purposes of the § 5318(g)

---

[38] "The director of the Department of Public Safety may appoint up to 50 special rangers who are employed by the Texas and Southwestern Cattle Raisers Association to aid law enforcement agencies in the investigation of the theft of livestock or related property." Tex. Code Crim. Pro. Ann. art. 2.125(a).

[39] The requirements to be appointed as a special ranger include that "(3) the executive director of the commission determines that the person meets minimum standards required of peace officers by the commission relating to competence, reliability, education, training, morality, and physical and mental health and issues the person a license as a special ranger; and (4) the person has met all standards for certification as a peace officer by the Texas Commission on Law Enforcement." Tex. Code Crim. Pro. Ann. art. 2.125(b).

safe harbor.

The Court did take notice of Plaintiff's argument that special rangers are not law enforcement because "[n]either the state nor any political subdivision or agency of the state shall be liable for any act or omission by a person appointed as a special ranger." Tex. Code Crim. Pro. Ann. art. 2.125(4)(g). It is also true that "[t]he Texas and Southwestern Cattle Raisers Association is liable for any act or omission by a person serving as a special ranger for the association that is within the person's scope of employment." *Id*. However, the Court does not find this distinction restrictive of the scope of authority granted to a special ranger under Tex. Code Crim. Pro. Ann. art. 2.125.

## IV. CONCLUSION

In conclusion, the undisputed facts show that Defendant is a financial institution, that Defendant made a voluntary report of a possible crime to a law enforcement authority, and that any liability of Defendant to Plaintiff under 11 U.S.C. §§ 362 or 524 derive from possible violations of a law of the United States within the scope of the safe harbor of 31 U.S.C. § 5318(g)(3). Defendant is thus entitled to summary judgment foreclosing liability to Plaintiff for the act of reporting Plaintiff's commission of a possible crime.[40]

---

[40] The Court here notes that it is not asked to decide, and makes no findings regarding, whether Plaintiff committed a crime.

The Court need not reach nor determine the other issues raised by the parties in their respective pleadings.[41]

Based upon the Court's consideration of the pleadings, the summary judgment evidence submitted, the relevant legal authorities, and for the reasons set forth herein, the Court concludes that the "Motion for Summary Judgement" filed by Defendant should be **GRANTED** on the basis that Defendant is protected from liability to Plaintiff under the safe harbor of 31 U.S.C. § 5318(g)(3). An appropriate order consistent with this opinion will be entered by the Court.

Signed on 08/24/2023

_____
THE HONORABLE JOSHUA P. SEARCY
UNITED STATES BANKRUPTCY JUDGE

---

[41] It is important to note the safe harbor only applies to financial institutions, and so a creditor other than a financial institution would not be similarly protected from liability.